UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

CHARLES H. FORD, IV,                                     :

                 Plaintiff,              :        03 Civ. 9587   (PAC)

    - against -                                    :        <u>OPINION & ORDER</u>

CONSOLIDATED EDISON COMPANY OF         :
NEW YORK, INC.
                Defendant.             :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


       HONORABLE PAUL A. CROTTY, United States District Judge:


       Plaintiff Charles H. Ford, IV ("Ford" or "Plaintiff"), a 15-year, union-represented

employee of Defendant Consolidated Edison Company of New York, Inc. ("Con Edison" or

"Defendant"), claims in this civil rights action both race discrimination and retaliation in violation

of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e <u>et</u> <u>seq.</u>, 42 U.S.C. § 1981, and New

York Executive Law § 296(1).  Con Edison now moves for summary judgment pursuant to Federal

Rule of Civil Procedure 56(c).  For the reasons set forth below, the Court grants Defendant's

motion for summary judgment in its entirety and dismisses Plaintiff's federal and state civil rights

claims with prejudice.

BACKGROUND

       Ford was hired by Con Edison as a Customer Field Representative (Meter Reader)

on September 17, 1990. (Compl. ¶ 2.)  While working as a meter reader, Ford exhibited what may

be described as an attitude problem.  Between May 1992 and October 1996, Ford received no less

1

than nine disciplinary warnings–in the form of counseling sessions, verbal warnings, and written warnings[1]–for unsatisfactory work performance and violating work rules, including failing to properly input his time, failing to cover the work assigned to him during his normal shift, and failing to follow directions. (Carey Aff., Exs. K & P.)  In one incident, for example, Ford was given a written warning for losing company property, violating a work rule and falsifying company documents, after Ford and his partner lost a company receipt book, failed to report the loss to supervisors, and then lied about the incident during the fact-finding hearing in an attempt to cover up the incident.[2] (Id., Ex. K (April 9, 1993 Employee Interview Form).)  As a result his recurring disciplinary problems, Ford did not receive a progression bonus in 1996. (Id., Ex. P.)

Between November 1996 and November 1999, Ford had no disciplinary incidents.  As a result, when Ford applied for a new position, Con Edison transferred him to Bronx Substations, a

---

[1] Con Edison maintains a policy of progressive discipline, meaning that repeat conduct will result in increasingly serious discipline, eventually leading to discharge if the employee fails to correct his behavior. (Joseph Aff., Ex. 12 (Supervisor's Guide to Disciplinary Actions for Weekly Employees, at 3).) Discipline progresses in five stages: (1) verbal warning; (2) written warning; (3) suspension from work without pay; (4) final warning; (5) discharge of the employee. (Id. at 4-9.)

While Con Edison subscribes to a progressive discipline program in the hopes of correcting its employee's unacceptable behavior prior to discharge, the company manual makes clear that supervisors are not required to follow all stages in succession. (Id. at 3-9.)  Depending upon the severity of the infraction, the supervisor may accelerate the discipline, meaning that the supervisor imposes a more severe form of discipline, without first imposing the less severe forms of discipline on the progressive list. (Id.)

Every disciplinary action taken by Con Edison against a union-represented employee is subject to union review, intervention, and grievance. (Id., Ex. 13 (Collective Bargaining Agreement, at 52-57).)

[2] During the interview, Ford was warned by his supervisor that company policy would normally call for a final warning and five-day suspension without pay for such an incident.  Because Ford's supervisor determined that the incident was, in part, the result of inadequate training, the supervisor rescinded the final warning and five-day suspension in Ford's case. (Carey Aff., Ex. K.)  The supervisor warned, however, that repeat conduct would result in further, progressive disciplinary action, including a final warning and suspension. (Id.)

division of Con Edison that distributes electrical power to seven networks throughout Manhattan and the Bronx.  Ford started as a General Utility Worker ("GUW"), the entry-level "operating employee" position,[3] with the hope of promotion to Assistant Substation Operator ("ASO") and then Senior Substation Operator ("SSO") over time. (Id., Ex. C (Chase Aff. ¶ 7).)  Less than one month after his transfer to Bronx Substations, Ford went on sick leave for 3½ months.[4] (Joseph Aff., Ex. 18.)  Upon his return, Ford began training to become an ASO, which requires that the employee pass a written and practical examination after undergoing classes and on-the-job training. (Def.'s Local Rule 56.1 Statement ¶ 10; Chase Aff. ¶ 6.)  Ford was assigned to a rotating shift (7am-3pm; 3pm-11pm; and 11pm-7am) at the Sherman Creek Substation to receive on-the-job training from Beresford Dick, an experienced, African-American SSO. (Def.'s Local Rule 56.1 Statement ¶ 11.)

Ford worked under Mr. Dick's supervision for 7 months, until November 2000, when Ford was ready to take the the the ASO written exam.[5] (Id.)  Ford passed the written test to become an Assistant Substation Operator on December 7, 2000. (Id. ¶ 14.)  On January 24, 2001, Ford took the practical examination, but failed. (Id.)  As a result, Ford remained a GUW, and was not promoted to ASO, even though most of the other GUWs who started at the Bronx Substations at

_____

[3] Operating employees carry out such tasks as electrical switching, monitoring and changing equipment, and turning off feeder cables. (Chase Aff. ¶¶ 7-9.)  Given the dangerous nature of the work performed by operating employees, all employees in the Substations Operation department must follow strict safety and reporting procedures. (Id. ¶¶ 14, 16.)  Each employee is required to log in and out each day, report to the Shift Manager or Supervisor when moving locations and keep supervisors informed of his whereabouts at all times. (Id. ¶ 16; Carey Aff., Ex. L.)

[4] Ford was on sick leave from December 2, 1999 through approximately March 19, 2000. (Joseph Aff., Ex. 18.)

[5] This was the last time that Ford was permitted to rotate with one operator.  For the rest of Ford's career as an GUW, he was required to work the day shift. (Ford Dep. 120:10-17, Nov. 9, 2004.)

the same time as Ford were all promoted to ASO. (Id. ¶ 16.)

On May 3, 2001, Ford filed a lawsuit against Con Edison in the New York Supreme Court for Bronx County alleging that the company misappropriated his idea for a company slogan. (Joseph Aff., Ex. 40.) According to Ford's complaint, in June 1999, Ford sent a letter to Mary McCartney, Director of Corporate Communications at Con Edison, suggesting the tagline "Con Ed is On" as a corporate slogan. (Id.) Ford's letter to Ms. McCartney included a number of ways that the slogan could be used–"When your electricity is off, Con Ed is On;" "For everything, Con Ed is On;" "Just think, Con Ed is On"–and included a telephone number where Ms. McCartney could contact Ford if she liked the idea. (Id.) Ms. McCartney never contacted Ford. (Id.)

Over a year later, on October 10, 2000, the Corporate Communications department at Con Edison sent out a company-wide e-mail announcing that the new company slogan was "Con Edison is On It." (Id.) The e-mail contained a number of examples of how the slogan would be used–"Think of all the ways Con Edison is On It;" "In every way, Con Edison is On It"–some of which struck Ford as similar to the suggestions he made in his June 1999 letter to Mary McCartney. (Id.) Claiming similarity between his idea and the new company slogan, Ford immediately wrote to Eugene R. McGrath, the Chief Executive Officer of Con Edison, and Ms. McCartney alleging theft of his idea. (Id., Exs. 1 & 27.) In the letter to Mr. McGrath, Ford wrote:

> Mr. McGrath, historically Black peoples' ideas have been taken and exploited for the betterment of society and industry – all while giving little or no mention of the true originator . . . from the creator of Elvis Presley's hit songs (Otis Blackwell), to the creator of the filaments in today's light bulbs (Lewis Lattimer).
>
> I'm sure this has happened to other people as well – but I make an issue of this angle only because I see it through black eyes and how it is redundant.
>
> So now, here I am working in a new department, unfairly demoted, not

4

> given a raise in over a year, and am now witnessing the same company
> that's doing all this to me is about to use a slogan idea I created – again
> while not giving me any inspiration that would make me want to further
> work for the betterment of "our company".[6]

(Id., Ex. 1, at 1-2.)

Ford's October 16, 2000 complaint to Eugene McGrath resulted in an internal audit of the matter. (Id., Ex. 40.) James P. O'Brien, the General Auditor for Con Edison, reviewed all the facts and concluded in a December 20, 2000 report that all similarities between Ford's idea and the new slogan were merely coincidental, and were not the result of plagiarism. (Id.) A copy of the report was given to Ford on January 10, 2001. (Id.) Unhappy with the results of the report, Ford retained an attorney, who sent a formal letter to the General Counsel of Con Edison demanding a more detailed explanation.

When Ford did not get a satisfactory response from either Ms. McCartney or Mr. McGrath, Ford filed a lawsuit in New York Supreme Court. (Id.) The lawsuit proceeded to discovery, but in October 2001, Con Edison provided evidence that the company had considered using "Con Ed is On" as early as 1997, when the slogan was presented to Con Edison by the advertising firm of Landor and Associates, a full two years before Ford submitted his "Con Ed is On" idea to Ms. McCartney. This ended the matter.[7]

---

[6] Ford now suggests to the Court that this language in his October 16, 2000 letter to Mr. McGrath constitutes a complaint about race discrimination, for which Ford was subsequently retaliated against by Con Edison.

Interestingly, Ford states in the McGrath letter that he was previously demoted and had been denied a raise for over a year. While the record does not contain sufficient records from 2000 to verify this statement, if this were true it would significantly undermine Ford's position in this litigation that Con Edison took adverse employment action against Ford only after he complained about misappropriation, in retaliation.

[7] While the parties did not submit a Stipulation discontinuing the action until September 4, 2002, it appears that the case remained inactive–except for Ford's application for reimbursement of litigation

Ford maintained a satisfactory disciplinary record until after the misappropriation lawsuit,[8] at which time Ford's attendance and reporting at work became less reliable. (Id., Ex. 34, at 5-6.) Ford's June 2001 Performance Evaluation noted that Ford "cannot be relied upon to be available for work." (Id., Ex. 17.) In July 2001, Ford was denied an internal transfer to another department due to his "unsatisfactory attendance record." (Id., Ex. 19.)

Ford's behavior did not improve. On October 30, 2001, Ford got a verbal warning, and then, on December 21, 2001, he received a three-day suspension and final warning,[9] both times for problems with attendance and reporting. (Id., Ex. 34; id., Ex. 9 (Chase Dep. 177:24-178:5, Jan. 20, 2005; Carey Aff., Ex. P.) Ford reported late for shift work, disappeared during shifts, worked an unscheduled shift without permission, and failed to report to his supervisor's office when ordered to do so. (Joseph Aff., Ex. 34; Chase Dep. 177:24-178:5; Carey Aff., Ex. P.)

In January 2002, Ford and Reggie Brown, a fellow GUW and an African American, decided to sit in on an SSO training class taught by Nelson Oliver, a seasoned SSO. (Carey Aff., Ex. O (Oliver Dep. 22:3-23:15, Jan. 25, 2005).) The class prepared current ASOs for promotion to

---

costs–from October 2001 until the September 2002 discontinuance. (See Carey Aff., Ex. U; Joseph Aff., Ex. 40.)

[8] Ford had a satisfactory disciplinary record from October 24, 1996 until October 20, 2001, when he received a verbal warning for unsatisfactory work performance. (Joseph Aff., Ex. 34, at 3 ("Resp. No. 1").) Ford's satisfactory performance during this period is also reflected in his performance evaluations up until late 2001. (See id., Ex. 17 (Aug. 9, 2000 and June 8, 2001 Performance Evaluation Reports).)

[9] Con Edison originally gave Ford a five-day suspension and all-inclusive final warning. Ford complained about the discipline to his union. The union grieved and the discipline was reduced to a three-day suspension and final warning after arbitration. Regardless of the arbitration, Ford now alleges that the imposition of discipline on December 21, 2001 was improper and discriminatory, particularly because Con Edison failed to follow its four-step progressive discipline policy, which would have called for a written warning on this occasion, not suspension. Because the suspension and final warning were upheld by an arbitrator, however, the Court will assume that this discipline was appropriate. (See id., Ex. 34, at 6.)

the position of SSO. (Id. 24:13-15.)  Ford and his colleague were still GUWs, however, so they

were behind the other students in the class. (Id. 24:11-25:3.)  After a few sessions, Mr. Oliver and

Michele Savino, Ford's manager at the time, removed Ford and Brown from Mr. Oliver's class,

explaining that the class was too advanced, and would not help them prepare for the ASO practical

examination.[10] (Id. 70:16-25; 71:19-72:2; 73:16-74:2, 74:22-75:9.)

On March 2, 2002, the new Area Manager put the Bronx Substation GUWs back on

rotating shifts.[11]  (Carey Aff., Ex. H (Galantich Aff. ¶ 5).)  Due to Ford's recent attendance

problems, however, Ford's supervisor kept Ford on the day shift, where there was greater

supervision.[12] (Id. ¶ 8)  Occasionally, Ford was put on a rotating schedule to work on an emergency

heating contingency, but otherwise Ford was on the day shift exclusively. (Id.; Ford Dep. 118:13-

18.)  Ford now claims that this inability to rotate denied him the opportunity to train with one

operator, thereby hindering his ability to advance with the company. (See Pl.'s Mem. Opp'n Summ.

J ("Pl.'s Mem."), at 4.)

Notwithstanding disciplinary problems, Ford continued to pursue a promotion to

ASO.  Ford retook and passed the ASO practical exam in April 2002. (Carey Aff., Ex. R.)  The

same month, however, Ford was again disciplined, this time for failing to properly report his

whereabouts to supervisors and then misrepresenting the facts when asked about it. (Id., Exs. W &

---

[10]   Neither Ford nor Brown had passed the practical examination to become an ASO, a prerequisite before they could train to become SSOs.  Therefore, Mr. Oliver's class, which prepared employees for SSO promotion, was not appropriate.

[11]   Sometime in or after November 2001, all GUWs in Bronx Substation were placed on the day shift. (Galantich Aff. ¶ 5.)

[12]   Ford claims that keeping him on the day shift, when other GUWs went back to rotating shifts, was discriminatory, though he admits that one other black GUW was permitted to rotate with the other, non-black GUWs. (Ford Dep. 141:15-25, 146:4-15.)

Z; Joseph Aff., Ex. 3 (Necaise Dep. 67:18-69:25, Jan. 19. 2005).) Ford was given a five-day suspension and his promotion to ASO was put on hold for six months, in accordance with a company policy allowing a supervisor to put a promotion on hold if an employee has been disciplined within 24 months of his promotion (as Ford had been).[13] (Carey Aff., Exs. W & Z; Galantich Aff. ¶¶ 6-7; Ford Dep. 149:14-21.)

In June 2002, Ford put in a request for vacation the week of July 4-July 12, 2002. (Ford Dep. 214:13-15.) The usual deadline for vacation requests was March 15, 2002, so Ford's request was late. (Id. 214:3-16.) Ford's supervisor denied the request for staffing reasons, since five other employees were already scheduled to be out that week, yet the summer heat contingency required maximum staffing.[14] (Id. 219:10-16; Joseph Aff., Ex. 36 ("Response No. 2"); Carey Aff., N(1) (Necaise Aff. ¶ 10).) At least one white employee was also denied vacation for the same week. (Necaise Aff. ¶ 13.)

On June 17, 2002, Ford had his annual performance evaluation. (Carey Aff., Ex.

---

[13] The six-month suspension of Ford's promotion was withdrawn only two months later, on June 28, 2002. (Carey Aff., Ex. AA; Galantich Aff. ¶ 7.)

[14] Ford suggests, without expressly stating, that the denial was discriminatory. Con Edison claims that another (white) employee also asked for vacation at that time and was denied vacation. (Necaise Aff. ¶ 10.) Ford does not respond to this statement in his Rule 56.1 statement, suggesting that he concedes this fact.

Con Edison claims that the denial was due to staffing needs, as Ford submitted his vacation request on June 25, 2002, long past the March 15 deadline for vacation requests, while other employees submitted their requests on time. (Joseph Aff., Ex. 15 & 16.) Ford emphasizes that he requested copies of the vacation requests from the other employees alleged to have requested vacation at the same time, but Con Edison denied the request, stating that no such records existed. In addition, Ford alleges that Luis G. Nieves, a non-black employee, was granted vacation for the period of July 17-19, 2002, about the same time Ford had requested time off, despite submitting his request after the March 15 deadline. (Id., Ex. 25.) Ford admits that on other occasions over the course of his employment, he was granted vacation requested after the usual March deadline. (Ford Dep. 216:6-13.)

BB.)  Due to his recent discipline, Ford did not receive a merit or progression wage increase.[15] (Id.)

At the evaluation, Ford inquired as to why his increase was being withheld and what that meant.

Ford's supervisor Jose Suarez stated: "It means you aren't getting jack shit." (Ford Dep. 94:8-10.)

While Ford claims that he was offended by this comment, he admitted in his deposition that it was

not a racially derogatory remark or comment, though he alleges that Mr. Suarez did not speak in

such vulgar terms to similarly situated non-black employees.[16] (Id. 94:24-95:3, 552:12-24.)

On June 28, 2002, Ford was promoted to ASO. (Carey Aff., Ex. AA.)  Ford's

disciplinary problems continued after the promotion.  Ford's October 27, 2002 performance

evaluation noted that Ford "resists changes in work situation, rules, [and] assignments," "on

occasion, reacts in an argumentative, uncooperative, tactless manner or is negative when dealing

with supervisors," "fails to perform required written tasks," and "cannot be relied upon to follow

job procedures or complete work in a timely manner." (Id., Ex. BB.)  On January 6, 2003, Ford

received a five-day suspension and an all-inclusive final warning for unauthorized absence,

falsifying company records related to overtime, and providing false information to a supervisor.

(Id., Ex. W.)  Only three weeks later, on January 31, 2003, Con Edison terminated Ford, on the

grounds that Ford failed to properly report to his supervisors when his 5-day suspension ended,

despite orders to do so, and displayed discourteous, insubordinate conduct to supervisors. (Id., Exs.

W & II; Galantich Aff. ¶¶ 14-15.)

---

[15] The collective bargaining contract between the Utility Workers' Union and the Con Edison provides that 0.5% merit wage increases and progression increases are granted to employees "whose records have in all respects been satisfactory during the preceding year." (Joseph Aff., Ex. 13 (Collective Bargaining Contract at 71).)

[16] Mr. Galantich disagrees, stating that he has heard Mr. Suarez use profanity, including the word "shit," in conversations with white individuals as well. (Galantich Aff. ¶ 9.)

Ford submitted grievances to his union complaining of his January 6, 2003 suspension and final warning and January 31, 2003 termination. (Carey Aff., Ex. II, at 3-4.) The union challenged both sets of discipline, and the dispute was submitted to arbitration. (Id. at 5.) While the key issue before the arbitrator was whether the January 6, 2003 discipline of Ford and January 31, 2003 termination of Ford were justified, the arbitrator did consider the possibility of race discrimination. (See id. at 5, 11, 21-22.)

Prior to rendering a decision, the arbitrator held five fact-finding hearings and gave both parties an opportunity to present evidence and examine witnesses. (Id. at 1.) The arbitrator found that Con Edison met its burden of proof on some, but not all of the charges supporting the challenged discipline. (Id.) In accordance with these findings, the arbitrator upheld the suspension and final warning, but determined that Ford's termination was not appropriate. (Id. at 19-22.) In light of Ford's prior disciplinary record, the arbitrator ruled that the termination should be reduced to a one-year disciplinary suspension without pay and that the all-inclusive final warning should be extended for an additional twelve-month period. (Id. at 21.)

Ford returned to work on January 25, 2004.[17] (Joseph Aff., Ex. 23.) He remains in the employ of Con Edison at the present time. (Carey Aff. ¶ 40.) Due to Ford's prior and continuing disciplinary problems, the all-inclusive final warning remains in effect and Ford has not

---

[17] Because the arbitrator upheld his suspension without pay, Ford's date of employment was adjusted for seniority purposes to reflect a starting date of August 17, 1991, rather than September 17, 1990, his actual start date. (Joseph Aff., Ex. 23.) As a result, Ford currently has one less year of seniority with the company–for purposes of promotion and bonuses, though not his pension–than he would if the he had never been terminated. Ford claims that Con Edison's refusal to credit the year is unlawful in light of the arbitrator's finding that the termination was not appropriate, and asks the Court to force Con Edison to credit him the year. (Pl.'s Mem., at 14.) The Court finds this requests to be inappropriate, as the proper means to challenge Con Edison's action would be through the union grievance process, a process with which Mr. Ford is quite familiar.

received the annual progression bonuses to which he would otherwise be entitled. (Joseph Aff., Ex. 17 (Oct. 20, 2005 Performance Evaluation).)

<u>Ford's Prior Complaints Against Con Edison</u>

Con Edison has its own EEO Affairs Department to address discrimination issues. (Carey Aff., Ex. JJ.)  Each Con Edison employee has an EEO representative. (<u>Id.</u>)  There is no evidence in the record that Ford ever contacted the Con Edison EEO Department to make a discrimination complaint.  Ford knew the EEO Department existed, but believed that complaining to the internal EEO Department was recommended but not required. (Pl.'s Local Rule 56.1 Statement ¶ 35.)

Ford has been represented by the Utility Workers' Union of America for the entire fifteen years of his employment at Con Edison.  Throughout that time, Ford never filed a grievance with his union complaining of discrimination. (Ford Dep. 155:9-12.)  Ford testified in his deposition that he contacted Dwyana Quick-Ford, his union representative, both in person and via e-mail in 2002, complaining of unfair treatment at work, particularly with regards to training, but these complaint never expressly mentioned race. (<u>Id.</u> 55:19-57:3, 199:17-205:5.)  Ms. Quick-Ford never filed a grievance on Ford's behalf in response to these complaints. (<u>Id.</u> 205:17-19.)

<u>Procedural History</u>

Ford filed a Charge of Discrimination with the Equal Employment Opportunity Commission on March 20, 2003, complaining that Con Edison's treatment of Ford was both discriminatory and retaliatory.  (Carey Aff., Ex. A (Charge of Discrimination filed with EEOC).)  Ford complains that virtually every action taken by Con Edison towards him is discriminatory, including inadequate training, imposing additional rules on Ford that other GUWs did not have to

follow, keeping Ford on the day shift when other GUWs got to rotate, giving Ford negative

performance evaluations, disciplining Ford on a frequent basis, denying Ford vacation in July 2002,

denying Ford progression raises, allowing a supervisor to tell Ford that he wasn't "getting jack shit"

for a bonus, putting a hold on Ford's promotion to ASO, and terminating Ford in January 2003.

(Id.) While Ford's theory of discrimination was jumbled, he appeared to offer overlapping

explanations for Con Edison's conduct: retaliation for bringing the May 2001 misappropriation

lawsuit, retaliation for complaining to supervisors and union representatives about lack of training,

intentional race discrimination, or some combination of all three. (Id.)

      At some point prior to August 13, 2003, Ford retained Willan Franklyn Joseph to

represent him in pursuing his charge of discrimination. (Joseph Aff., Ex. 16.) From that point

forward, all correspondence between Ford and the EEOC was forwarded through Mr. Joseph's

office. (Id.; Carey Aff., Ex. E.) After thoroughly investigating Ford's charge, on August 26, 2003,

the EEOC issued a Notice of Right to Sue ("right-to-sue letter") informing Ford that the EEOC was

dismissing the case because it was not convinced, on the information provided,[18] that Con Edison

had violated any of the civil rights statutes. (Joseph Aff., Ex. 9 (EEOC Notice of Right to Sue).)

The right-to-sue letter was issued directly to Ford, at his proper Bronx, New York address, with

copies sent to his attorney and to Defendant. (Id.) The same day, a copy of the right-to-sue letter

was mailed, along with a detailed assessment letter, to "Charles H. Ford, IV, c/o Willan Franklyn

Joseph, Esq.," at Mr. Joseph's Philadelphia, Pennsylvania office address. (Id.) Mr. Joseph received

the letter on August 28, 2003. (Carey Aff., Ex. E.)

---

[18] In addition to Ford's Charge, the EEOC had a position letter from Con Edison and a rebuttal letter from Ford that was forwarded to the EEOC by Ford's attorney, Willan Franklyn Joseph, Esq. (Joseph Aff., Exs. 15 & 16.)

Ford filed this action on November 28, 2003. (Compl., at 6.). In addition to alleging the same Title VII and § 1981 violations as the prior Charge to the EEOC, for good measure Ford added a claim of retaliation for filing the EEOC Charge. (Compl. ¶¶ 6-31.)

DISCUSSION

I. Plaintiff's Title VII Claims Must be Dismissed as Time Barred

Under Title VII of the Civil Rights Act of 1964, a plaintiff has 90 days from receipt of the right-to-sue letter from the EEOC to file an action in federal court. 42 U.S.C. § 2000e-5(f)(1). The ninety-day period begins to run from the date the claimant receives the Notice of Right to Sue letter in the mail. 42 U.S.C. § 2000e-5(f)(1); Sherlock v. Montefiore Med. Ctr., 84 F.3d 522, 525 (2d Cir. 1996). While the ninety-day filing requirement is not jurisdictional, courts apply this requirement strictly and waive it only if equitable considerations justify an extension. Johnson v. Al Tech Specialities Steel Corp., 731 F.2d 143, 146 (2d Cir. 1984); Francis v. Elmsford Sch. Dist., No. 04 Civ. 2687 (HB), 2005 WL 151924, at *3 (S.D.N.Y. Jan. 25, 2005). "Equitable tolling is appropriate only when a party 'was prevented in some extraordinary way from exercising his rights' and is limited to 'rare and exceptional circumstances.' " Francis, 2005 WL 151924, at *4 (quoting Zerilli-Edelglass v. N.Y. City Transit Auth., 333 F.3d 74, 80 (2d Cir. 2003)). Furthermore, a court should allow equitable tolling only where the claimant "has acted with reasonable diligence during the time period [he] seeks to have tolled and has proved that the circumstances are so extraordinary that the doctrine should apply." Zerilli-Edelglass, 333 F.3d at 80-81.

Plaintiff failed to file his Notice of Right to Sue within the 90-day filing deadline. Plaintiff's attorney, received the Notice of Right to Sue on August 28, 2003. (Carey Aff., Ex. E.)

This gave Plaintiff until November 26, 2003 to file his Title VII action in federal court. Plaintiff did not file this action until November 28, 2003, however, two days late. Plaintiff contends, however, that the 90-day filing period did not begin to run until he himself received the right-to-sue letter; receipt of the right-to-sue letter by Plaintiff's attorney does not suffice.[19] (Pl.'s Mem., at 8.)

Plaintiff's argument is a technical one, based on the language of the statute, and not on any equitable considerations. Plaintiff does not argue that he used reasonable diligence to pursue the action during the time period that he now seeks to have tolled, or that he was prevented from pursuing the action during the statutorily mandated 90-day period by anyone other than himself and his own attorney. In fact, the only reason the EEOC had Mr. Joseph's address on file is because sometime prior to August 13, 2003, Mr. Joseph began contacting the EEOC on Plaintiff's behalf, creating the impression that he represented Ford in the EEOC investigation. (See Joseph Aff., Ex. 16 (Ford's rebuttal of Con Edison's position statement to the EEOC); Carey Aff., Ex. E (Letter from Mr. Joseph to EEOC, Dec. 12, 2003).) Mr. Joseph continued to correspond with the EEOC on Plaintiff's behalf after he received the right-to-sue letter on August 28, 2003 (Carey Aff., Ex. E), revealing that Plaintiff and Mr. Joseph had an on-going relationship, and that Mr. Joseph could have shown Plaintiff the right-to-sue letter at any point after its receipt. Thus, are no equitable considerations that would weigh in favor of tolling the 90-day filing period. Instead, Plaintiff simply argues that the language of Title VII requires the EEOC to notify "the person claiming to be aggrieved," 42 U.S.C. § 2000e-5(b), which is Plaintiff. Since the EEOC sent the right-to-sue letter to Plaintiff's attorney instead, it is in violation of the statute, and therefore the filing deadline must be tolled in Plaintiff's favor.

---

[19]     In fact, Plaintiff claims that he did not see the EEOC right-to-sue letter until his deposition on February 2, 2005. (Pl.'s Mem., at 8.)

Mr. Joseph's argument is severely flawed.  Once Plaintiff retained Mr. Joseph to act on his behalf , and Mr. Joseph contacted the EEOC in this representative capacity, notice to Mr. Joseph was notice to Plaintiff. See, e.g., Holmes v. NBC/GE, 914 F. Supp. 1040, 1042 n.3 (S.D.N.Y. 1996) ("Receipt of the right-to-sue letter by plaintiff's attorney is considered implied notice to plaintiff of the contents thereof and triggers commencement of the 90-day limitation period."); Jones v. Madison Serv. Corp., 744 F.2d 1309, 1312 (7th Cir. 1984) (holding that the 90-day limitations period "begins to run on the date that the right-to-sue notice is actually received by either the claimant or by the attorney representing him"); Gonzalez v. Stanford Applied Eng'g, Inc., 597 F.2d 1298, 1299 (9th Cir. 1979) (finding that receipt of right-to-sue letter by attorney was sufficient where attorney had contacted EEOC on plaintiff's behalf requesting issuance of right to sue). Plaintiff had constructive notice of his right-to-sue the moment his attorney received notice from the EEOC, and therefore the limitations period began to run from that date. See Jones, 744 F.2d at 1312 & n.5.  "To hold differently would allow claimants to completely repeal the limitations set by Congress."  Minor v. Lakeview Hosp., 421 F. Supp. 485, 487 (E.D. Wis. 1976).  Plaintiff has not provided any evidence that he was prevented from filing this action within the statutorily mandated 90-day period by anyone other than himself and his own attorney.  Therefore, equitable tolling is not appropriate in this case. See Holmes v. State Univ. of New York at Buffalo, No. 88 Civ. 905C, 1997 WL 489779 (S.D.N.Y. Sept. 9, 1992) (observing that "equitable tolling is to be restricted and reserved only for situations in which the claimant has made a good faith error . . . or has been prevented in some extraordinary way from filing his complaint in time" (quoting Jones, 744 F.2d at 1314)).  Accordingly, Plaintiff's Title VII claims are dismissed as time barred.

II.  Plaintiff Fails to Establish Either Discrimination or Retaliation in Violation of 42 U.S.C. § 1981

Plaintiff also brings claims of discrimination and retaliation pursuant to 42 U.S.C. § 1981, the federal statute prohibiting private parties from discrimination on the basis of race or color. Claims brought under 42 U.S.C. § 1981 are not subject to the same administrative requirements as claims under Title VII. Therefore, a plaintiff may bring a claim under § 1981 without first having to file a Charge with the EEOC, so Plaintiff's § 1981 claims survive his failure to file this federal action within ninety days of receipt of the EEOC Notice of Right to Sue.

It is difficult to analyze Plaintiff's case because of poor pleading, and the resulting confusion concerning Plaintiff's legal theories and the facts he relies on to support them. Unable to establish a clear causal connection between Defendant's conduct and any one protectible category, Plaintiff pleads two different legal theories to justify relief: Plaintiff clearly charges that Defendant retaliated against him for bringing the May 2001 misappropriation lawsuit against Con Edison, though he does not explain how this is a protected activity under § 1981. At the same time, however, Plaintiff charges disparate treatment on the basis of race, and points to the same allegedly retaliatory conduct as evidence of discriminatory conduct. Plaintiff treats these two claims as both overlapping and alternative, suggesting that Defendant's misappropriation of Plaintiff's "Con Ed is On" slogan (for which the Court notes there is absolutely no factual basis), which brought about the lawsuit that led to the retaliation, was itself an instance of discrimination.[20] In an attempt to clarify the issues, the Court will treat Plaintiff's discrimination and retaliation claims as alternative theories and will review each separately.

A. Summary Judgment Standard

---

[20] To the extent that Plaintiff alleges that theft of Plaintiff's idea was discriminatory, consideration of this event, which took place in 1999 and early 2000, is barred by the three-year statute of limitations applicable to § 1981 actions in New York.

Summary judgment shall be granted only where "there is no genuine issue of material fact," so the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The party seeking summary judgment has the burden of demonstrating that no genuine issue of material fact exists. Powell v. Nat'l Bd. of Med. Exam'rs, 364 F.3d 79, 84 (2d Cir. 2004) (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970)). If the moving party establishes the absence of a genuine issue of material fact, "a limited burden of production shifts to the nonmovant, who must 'demonstrate more than some metaphysical doubt as to the material facts,' and come forward with 'specific facts showing that there is a genuine issue for trial.'" Id. (quoting Aslanidis v. United States Lines, Inc., 7 F.3d 1067, 1072 (2d Cir. 1993)). If the nonmoving party fails to establish a genuine issue of material fact, summary judgment must be granted. Id. In determining whether a genuine issue of material fact exists, the Court must examine all evidence in the light most favorable to the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (2002); Make the Road by Walking, Inc. v. Turner, 378 F.3d 133, 142 (2d Cir. 2004).

Summary judgment is rarely appropriate in employment discrimination cases, where the employer's intent and state of mind are in dispute. Carlton v. Mystic Transp., Inc., 202 F.3d 129, 134 (2d Cir. 2000). While summary judgment is available to defendants in discrimination cases, see Jeffrey, 426 U.S. at 551, 553-54; Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 466 (2d Cir. 2001); Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000), its use is limited to situations in which there is a complete lack of evidence in support of the plaintiff's position, or the evidence is so overwhelming slanted in favor of the defendant "that any contrary finding would constitute clear error." Danzer v. Norden Sys., Inc., 151 F.3d 50, 54 (2d Cir. 1998). Still, a plaintiff "is not entitled to a trial simply because the determinative issue focuses on the defendant's state of

mind." <u>Dister v. Continental Group, Inc.</u>, 859 F.3d 1108, 1114 (2d Cir. 1988). As this Circuit has cautioned:

> The summary judgment rule would be rendered sterile . . . if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion. Indeed, the salutary purposes of summary judgment–avoiding protracted, expensive and harassing trials–apply no less to discrimination cases than to commercial or other areas of litigation.

<u>Meiri v. Dacon</u>, 759 F.2d 989, 998 (2d Cir. 1985); <u>see</u> <u>also</u> <u>St. Mary's Honor Ctr. v. Hicks</u>, 509 U.S. 502, 524 (1993) ("[T]he question facing the trier of fact in discrimination cases is both sensitive and difficult. . . . But none of this means that trial courts or reviewing courts should treat discrimination differently from other ultimate questions of fact." (quoting <u>U.S. Postal Serv. Bd. of Governors v. Aikens</u>, 460 U.S. 711, 716 (1983) (internal quotation marks omitted))). As in any other case on summary judgment, a plaintiff in a discrimination case "must nevertheless offer '*concrete evidence* from which a reasonable juror could return a verdict in his favor." <u>Dister</u>, 859 F.2d at 1114 (emphasis added) (internal quotation marks and citation omitted).

The Court must grant summary judgment for defendant where plaintiff's evidence is "merely colorable, conclusory, speculative, or not significantly probative." <u>Dodd-White v. Lenox Hill Hosp.</u>, No. 02 Civ. 5749, 2004 WL 2337016 (S.D.N.Y. Oct. 18, 2004) (citing <u>Anderson</u>, 477 U.S. at 249-50). Plaintiff cannot create a disputed issue of fact by offering "conclusory allegations, conjecture, and speculation." <u>Niagara Mohawk Power Corp. v. Jones Chem., Inc.</u>, 315 F.3d 171, 175 (2d Cir. 2003) (quoting <u>Kerzer v. Kingly Mfg.</u>, 156 F.3d 396, 400 (2d Cir. 1998)). Instead, to survive summary judgment, Plaintiff's facts "must be material and of a substantial nature, not fanciful, frivolous, gauzy, spurious, irrelevant, gossamer inferences, conjectural, speculative, nor merely suspicions." <u>Contemporary Mission v. U.S. Postal Serv.</u>, 648 F.2d 97, 107 n.14 (2d Cir.

1981) (internal citations and quotation marks omitted).

B. Plaintiff's Claims of Discrimination Under 42 U.S.C. § 1981

Section 1981 protects against discrimination on the basis of race or color. Choudhury v. Polytechnic Inst. of New York, 735 F.2d 38, 42 (2d Cir. 1984). The statute guarantees to all persons an equal right "to make and enforce contracts," 42 U.S.C. § 1981(a), which in 1991 was amended to include "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b). Therefore, a plaintiff alleging employment discrimination on the basis of race may bring a claim under § 1981 in addition to, or instead of, a claim for discrimination under Title VII, 42 U.S.C. § 2000e et seq.

The Court reviews Defendant's motion for summary judgment under the three-part burden-shifting test set forth in McDonnell-Douglas Corp. v. Green, 411 U.S. 792 (1973).[21] First, plaintiff must establish a prima facie case that he suffered from a discriminatory employment action on the basis of his race, "by either direct, statistical or circumstantial evidence." Bickerstaff v. Vassar College, 196 F.3d 435 (2d Cir. 1999); McDonnell-Douglas, 411 U.S. at 802. This burden is minimal. Carlton v. Mystic Transp., Inc., 202 F.3d 129, 134 (2d Cir. 2000). The burden then shifts to defendant to provide a legitimate, nondiscriminatory reason for its actions. St. Mary's Honor Center v. Hicks, 509 U.S. 502, 506 (1993); McDonnell Douglas, 411 U.S. at 802; Dawson v. Bumble & Bumble, 398 F.3d 211, 216 (2d Cir. 2005).[22] If an employer articulates a

---

[21] "The same elements constitute a claim for employment discrimination under § 1981 as under Title VII." Choudhury, 735 F.2d at 44.

[22] This Circuit has observed:

The defendant's burden of production also is not a demanding one;

nondiscriminatory reason for its conduct, the inference of discrimination raised by plaintiff's <u>prima</u> <u>facie</u> case "simply drops out of the picture," <u>St. Mary's Honor Ctr.</u>, 509 U.S. at 511, and the burden shifts back to plaintiff to prove that the employer's nondiscriminatory explanation is pretextual. <u>St. Mary's Honor Ctr.</u>, 509 U.S. at 507-08.

### 1. Plaintiff's prima facie case of discrimination

Rather than apply the <u>McDonnell Douglas</u> test formalistically, the Court will assume that Plaintiff has made out a <u>prima</u> <u>facie</u> case of discrimination.[23] <u>See, e.g.</u>, <u>Peterson v. City Coll.</u>, 32 F. Supp. 2d 675,685 (S.D.N.Y. 1999); <u>Evans v. Golub Corp.</u>, 29 F. Supp. 2d 194, 200-01

---

> defendant need only offer such an explanation for the employment decision. Although the burden of production shifts to the defendant, the ultimate burden of persuasion remains always with plaintiff.

> <u>Bickerstaff v. Vassar Coll.</u>, 196 F.3d 435, 447 (2d Cir. 1999).

[23]   To establish a claim of disparate treatment in the employment context, plaintiff must show: (1) he is a member of a protected race; (2) he was qualified for the position; (3) he was subject to an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of discrimination. <u>Dawson v. Bumble & Bumble</u>, 398 F.3d 211, 216 (2d Cir. 2005); <u>Rosen v. Thornburgh</u>, 928 F.2d 528, 532 (2d Cir. 1991) (citing <u>McDonnell Douglas</u>, 411 U.S. at 802).

Defendant takes the position that Plaintiff fails to make out even a minimal prima facie case of discrimination. Defendant concedes that Plaintiff is a member of a protected race (African American) and he was subject to adverse employment actions (discipline and eventual discharge), but it argues that Plaintiff fails to establish that he performed his job satisfactorily (factor #2) or that his treatment occurred under circumstances giving rise to an inference of discrimination (factor #4).

While the Court agrees that Plaintiff's multitude of disciplinary violations raise doubt as to the whether Plaintiff performed his job satisfactorily, Plaintiff remains in the employ of Defendant at the present time, suggesting that Plaintiff is at least minimally qualified for his position as Assistant Substation Operator. Further, while the Court agrees that Plaintiff's evidence is scant, Plaintiff does submit some evidence–<u>e.g.</u>, of the employees who took the ASO practical examination around the same time, the only two employees to fail the exam were the two African-American GUWs; Plaintiff was denied the opportunity to work rotating shifts when other, non-African- American GUWs were permitted to rotate–that, if unexplained by Defendant, could lead to a reasonable inference that race discrimination was a motivating factor in Defendant's conduct. Thus, reading all evidence in the light most favorable to Plaintiff, and bearing in mind that Plaintiff's burden at this stage is minimal, the Court will assume that Plaintiff establishes a <u>prima</u> <u>facie</u> case.

(S.D.N.Y. 1998) (skipping the first two steps of the <u>McDonnell Douglas</u> analysis to get to the "ultimate question" of whether plaintiff presented sufficient evidence for a reasonable jury to find that the defendant's conduct was motivated by discrimination); <u>Jugeta v. Perry</u>, No. 95 Civ. 10303, 1997 WL 742535, at *4 (S.D.N.Y. Dec. 1, 1997) (same); <u>Padob v. Entex Info.Serv.</u>, 960 F. Supp. 806, 812 (S.D.N.Y. 1997) (same); <u>see</u> <u>also</u> <u>Lapsey v. Columbia Univ.</u>, 999 F. Supp. 506, 515 (S.D.N.Y. 1998) (listing cases in which the court assumed, without detailed analysis, that the plaintiff established a prima facie case of discrimination). Instead, the Court will proceed directly to the last two steps in the McDonnell Douglas inquiry: whether Defendant has provided a legitimate, nondiscriminatory explanation for its conduct, and, if so, whether Plaintiff has rebutted this explanation with evidence of pretext.

### 2. Defendant's Legitimate Nondiscriminatory Explanation

Defendant firmly establishes a legitimate, nondiscriminatory reason for disciplining Plaintiff: Plaintiff's unprofessional and insubordinate conduct in the workplace. Its evidence includes affidavits and deposition testimony of Plaintiff's former supervisors, all of whom testify to a pattern of lateness, poor attendance, and irregular reporting by Plaintiff (Carey Aff., Exs. G, H, N(1) & N(2)), performance evaluations showing Plaintiff's unsatisfactory performance (<u>Id.</u>, Ex. BB; Joseph Aff., Exs. 15 & 17), and e-mails and Employee Interview Forms documenting Plaintiff's decade-long history of counseling, verbal and written warnings, and suspensions for various disciplinary violations (Carey Aff., Exs. K, P, W, Z & LL). Defendant also presents a copy of an arbitration award—rendered by a neutral, third-party arbitrator, after multiple hearings (attended by both Plaintiff and his union representative) and a full opportunity for both sides to present evidence and examine witnesses—that finds that Defendant "had reasonable cause" to

impose discipline upon Plaintiff on January 6, 2002.[24] (Id., Ex. II, at 15-16.)  This evidence is more

than sufficient under the McDonnell Douglas standard to establish a legitimate, nondiscriminatory

reason for Defendant's conduct.

     *3. Pretext*

     Plaintiff argues that Defendant's legitimate, nondiscriminatory reason for

disciplining him is pretextual, and the real reason for Defendant's conduct is race discrimination,

though he provides no evidence to support this contention.  Perhaps recognizing the insufficiency

of his evidence, Plaintiff suggests in his opposition papers that he does not need to present concrete

evidence of pretext, since Defendant "bears the burden of proof to prevail on summary judgment."

(Pl.'s Mem., at 8.)  This argument reflects a complete misunderstanding of the law governing

employment discrimination.  Once an employer has established a legitimate, nondiscriminatory

reason for its conduct, the presumption of discrimination created by Plaintiff's prima facie case

"simply drops out of the picture." St. Mary's Honor Ctr., 509 U.S. at 511.  The burden then shifts

back to the Plaintiff to establish that Defendant's legitimate, non-discriminatory explanation is

mere pretext. Id. at 510.  Thus, while it is true that on  a motion for summary judgment the

defendant bears the burden of establishing that no genuine issue of material fact exists for trial, a

plaintiff claiming race discrimination "retains the burden of persuasion" on the issue of

discrimination. Id. at 518 (quoting Texas Dep't Cmty. Affairs v. Burdine, 450 U.S. 248, 256

(1981)).  In order to survive a motion for summary judgment, plaintiff must offer concrete,

admissible evidence from which a reasonable jury could find purposeful discrimination by the

---

[24]  Specifically, the arbitrator found that Defendant had proven by clear and convincing evidence
that Plaintiff falsified company documents and failed to notify a shift manager of his location, in violation
of a company work rule. (Carey Aff., Ex. II, at 15-16.)

defendant.

At the pretext stage, "the factual inquiry proceeds to a new level of specificity." Id. at 516 (quoting Burdine, 450 U.S. at 255). "[T]he inquiry now turns from the few generalized factors that establish a prima facie case to the specific proofs and rebuttals of discriminatory motivation the parties have introduced." Id. Plaintiff must provide enough evidence of pretext that a rational fact finder could conclude that the employer's "presumptively valid reasons" for its conduct "were in fact a coverup for a racially discriminatory decision." McDonnell Douglas, 411 U.S. 805.

A plaintiff attempting to establish pretext "may not prevail by establishing only [falsity], but must prove, in addition, that a motivating reason was discrimination." Bickerstaff v. Vassar Coll., 196 F.3d 435, 447 (2d Cir. 1999) (internal quotation marks and citations omitted). "The plaintiff retains the burden of persuasion." St. Mary Honor Ctr., 509 U.S. at 518 (quoting Burdine, 450 U.S. at 256). It is not enough for plaintiff to show that he was harshly treated, or even that defendant's stated reasons for its employment actions are pretextual. "The evidence as a whole must be sufficient to sustain an 'ultimate finding' of intentional discrimination." Peterson, 32 F. Supp. 2d at 684 (citing Fisher, 114 F.3d at 1338).

Plaintiff fails to meet the burden imposed on him by McDonnell Douglas. Although Plaintiff makes conclusory allegations of pretext, those allegations are completely undermined by the largely undisputed evidence that Plaintiff disappeared during shifts, failed to report to his supervisors when requested to do so, obstructed investigations by lying and withholding information from supervisors when questioned by supervisors about his conduct, inaccurately reported his time for purposes of record-keeping and overtime, and engaged in other similar

conduct in violation of company rules.  Even when drawing all reasonable inferences in the light most favorable to Plaintiff, however, the record as a whole does not establish a genuine issue of fact as to pretext.  No reasonable jury could infer from Plaintiff's evidence that Defendant disciplined Plaintiff because of his race.

Plaintiff disagrees, and claims that he raised genuine issues of material fact with respect to pretext.  At various points throughout his motion papers and oral argument, Plaintiff points to the following facts to support his position: (a) Defendant held disciplinary interviews, at which disciplinary sanctions were imposed on Plaintiff, without the presence of Plaintiff's accusers or the proper supervisor; (b) Defendants gave contradictory statements, particularly with regard to the explanations it gave the EEOC about why it removed Plaintiff from Nelson Oliver's training class and why it denied Plaintiff's internal transfer in July 2001; (c) Defendant failed to follow its own four-step progressive disciplinary system when disciplining Plaintiff, often skipping steps and imposing a harsher discipline than necessary; (d) Non-African-American operators were permitted to rotate shifts, while Plaintiff was placed on day shifts only, a result that Plaintiff claims hindered his ability to receive adequate training in preparation for promotion examinations; (e) Defendant denied Plaintiff requested vacation, purportedly because of staffing issues, but then allowed a non-African-American employee to take vacation around the  same time; (f) Defendant withheld Plaintiff's promotion, even after he passed all required promotion examinations, and denied Plaintiff progression bonuses; and (g) a neutral, third-party arbitrator found that Plaintiff's termination in January 2003 was not justified. The Court will consider each of these allegations in turn.

*(a) Holding disciplinary interviews without the presence of Defendant's accusers or the appropriate supervisor*

In an effort to establish that he was treated differently because of his race, Plaintiff alleges that Defendant "deprived him of fundamental fairness by holding disciplinary meetings without his accuser being present."[25] (Pl.'s Mem., at 10.)  As proof of this allegation, Plaintiff submits excerpts from the deposition testimony of Michael Galantich, a manager in Defendant's employ, in which Mr. Galantich testified that he does not recall if Plaintiff's direct supervisor was present at two different fact-finding hearings. (See id.)  Plaintiff provides no explanation of how the fact that Plaintiff's direct supervisor was not present at two company-initiated, disciplinary fact-finding hearings proves racial discrimination, and the Court can find none.  Plaintiff does not present any evidence connecting Defendant's failure to have Plaintiff's direct supervisor attend these fact-finding meetings to Plaintiff's race, nor does he present evidence that similarly situated non-African-American employees were treated differently.  Instead, Plaintiff asks the Court to find that a reasonable jury could infer from the "fundamental [un]fairness" of Defendant's conduct that impermissible motives were afoot.  The Court will not, indeed cannot, permit such a wholly conclusory inference.

### (b) Removal of Plaintiff from Nelson Oliver's training class

Plaintiff also alleges that Defendant removed Plaintiff from Nelson Oliver's training class because of his race.  While Plaintiff provides no direct or circumstantial connecting the incident to race, Plaintiff alleges that Defendant gave inconsistent explanations for why it removed Plaintiff from the class at different points in this litigation, and argues that these inconsistencies are sufficient to create a disputed issue of fact as to whether Defendant's legitimate, nondiscriminatory

---

[25]     This allegation refers to the fact-finding hearings that Defendant holds prior to disciplining any employee. (See Joseph Aff., Ex. 12 (Con Edison Supervisor's Guide to Disciplinary Actions for Weekly Employees).)

reason is pretext.[26]  In its position statement to the EEOC, Defendant explained that it removed

Plaintiff from Nelson Oliver's training course because Plaintiff "was ineligible" since the training

"included advanced subjects and was for employees who had already passed their written tests to

become Senior Substation Operators, which [Plaintiff and his GUW colleague] had not." (Joseph

Aff., Ex. 15 (Con Edison's Position Statement to EEOC, at 1).)  Later, in a written response to

Plaintiff's request for production of documents, Defendant expanded its earlier statement to the

EEOC, explaining that "the training . . . was for employees who had already passed their written

and practical tests to become Senior Substation Operations." Id., Ex. 35, at 5 ("Response No. 3").)

Defendant contends that these two statements are "inconsistent" and asks the Court to find that

Defendant's inconsistent statements are evidence of pretext.

　　　　Defendant's statements are not inconsistent, and Plaintiff's claims to the contrary are

meritless.  Defendant first stated that Nelson Oliver's class was intended for individuals who passed

the written test to become SSOs, and later stated that the class was intended for individuals who

passed both the written and practical tests to become SSOs.  While the second statement provides

slightly more information than the first, it is not "inconsistent" with the first, as both statements

convey the same message: Nelson Oliver's class was intended for Con Edison employees training

to become SSOs, and therefore Plaintiff, a GUW, was not qualified to attend the class.  Plaintiff

cannot capitalize on Defendant's voluntary correction of its prior statement to the EEOC to create

an inconsistency that does not exist.

---

[26]　To bolster his claim that removal from Nelson Oliver's class was discriminatory, Plaintiff also
alleges that after Plaintiff was promoted to ASO, he attended a training class and discovered that non-
African-American employees who were not qualified to attend the class were permitted to sit in.  Plaintiff
does not identify which course he refers to or the "unqualified" attendees of which he speaks.  In fact,
Plaintiff provides no evidence, other than his own self-serving testimony, to support his story.  As such,
the Court refuses to even entertain this claim.

*(c) Failure to follow four-step progressive disciplinary program*

Plaintiff claims that he was disciplined more harshly than other employees because of his race. To bolster this claim, Plaintiff alleges that Defendant failed to follow its own internal progressive discipline policy when it disciplined Plaintiff, skipping stages in the disciplinary progression in order to impose more severe forms of discipline than the four-step policy allows. Plaintiff states: "Con Edison says it has a progressive discipline policy, and it says that it has followed it. But in [Plaintiff's] case, it did not follow it . . . . The fact was that, under certain circumstances, . . . [Plaintiff] was supposed to have verbal warning beforehand. And in his case, that did not happen." (Oral Argument Tr. 14-15, Dec. 7, 2005.) Plaintiff's argument, while difficult to piece together, appears to be that a reasonable jury could infer from this internal procedural irregularity that Defendant treated Plaintiff differently from other similarly-situated employees because of his race.

Plaintiff's argument is completely frivolous. Nothing mandates that Defendant or the union compulsively adhere to each step in the disciplinary chain each time discipline is imposed. In fact, the Supervisor's Guide to Disciplinary Actions for Weekly Employees, a booklet published by Defendant to help guide supervisors on how to discipline employees under their supervision, makes clear that progressive discipline is not always appropriate and supervisors should consider a number of factors when deciding what form of discipline to impose, including "the nature, circumstances, and seriousness of the offense" and "the employee's prior record." (Joseph Aff., Ex. 12, at 1, 3-9.) Further, it is clear that whatever disciplinary course Defendant followed, Plaintiff also had the option of complaining to the union, and the union could object and grieve. (Id., Ex. 13.) Bypassing one step, or several steps (e.g. a written warning without first issuing a verbal warning), does not

violate Defendant's internal discipline policies or serve as evidence of procedural irregularities from which a reasonable jury could infer discrimination.  Defendant had a right to decide, in its independent business judgment, what form of discipline was appropriate each time Plaintiff, an employee bound to adhere to the company code of conduct, violated Defendant's rules.  Plaintiff cannot rewrite Defendant's disciplinary policies to create genuine issues of fact or raise spurious race discrimination inferences.  Allowing a jury to infer from the type of discipline imposed by Defendant in each case that Plaintiff was the victim of race discrimination would be wholly inappropriate.  Such gossamer inferences are completely inappropriate.  Without concrete evidence that similarly situated non-African-American employees were disciplined differently for the same offenses, no reasonable jury could find from the types of discipline imposed by Defendant that it disciplined Plaintiff because of his race.

> *(d) Keeping Plaintiff on the day shift, while other employees were permitted to rotate*

Plaintiff also asserts that Defendant's decision to keep him on the day shift, when other GUWs were permitted to work rotating shifts, was the result of race discrimination. Defendant contends, however, that Plaintiff was kept on the day shift because it was easier for supervisors to monitor Plaintiff's whereabouts during the more heavily staffed day shift.  Again, Plaintiff presents no evidence to rebut this explanation, he merely suggests that a reasonable jury could choose to believe Plaintiff over Defendant.  What Plaintiff does not appear to understand is that, even in race discrimination cases, plaintiff must present some actual evidence of discrimination to rebut the defendant's legitimate, nondiscriminatory explanations for its conduct. The mere incantation of the word "pretext" by a discrimination plaintiff is not sufficient.

> *(e) Denial of vacation time*

Plaintiff further asserts that he was denied vacation time in July 2002 because of his race. Defendant claims that it denied Plaintiff vacation the week of July 4-12, 2002 because of staffing concerns. Defendant submits undisputed evidence that Plaintiff's request was eight-weeks late;[27] by the time Plaintiff asked for the days off, five other employees were already out the same week; and New York City was on a heat contingency due to the hot summer, requiring maximum staffing. Plaintiff does not dispute this evidence, but instead argues that these facts, while true, could not be the real reason why Plaintiff was denied vacation since Luis Nieves, a non-African-American employee who also submitted his vacation request after the March 15 deadline, was granted vacation around the same time. In making this argument, Plaintiff completely ignores the fact that Mr. Nieves requested his vacation on July 7, 2002, for the date of July 17, 18, and 19, a full two weeks after Plaintiff's requested vacation. By this time, Defendant's staffing needs could very well have changed, thereby prompting Defendant to grant Mr. Nieves's vacation. The mere fact that Plaintiff and Mr. Nieves are of different races does not allow the conclusion that Plaintiff's vacation request was denied because of his race.

*(f) Withholding of promotion and denial of progression bonuses*

Plaintiff alleges that Defendant's two-month withholding of his promotion to ASO and its denial of Plaintiff's progression bonuses were racially motivated. Plaintiff's claims are not supported by the evidence, however, as Plaintiff admits that both decisions were permitted by Defendant's company policy and the Collective Bargaining Agreement. First, Plaintiff conceded in his deposition that Defendant has a right to withhold an employee's promotion if the employee has

---

[27] Con Edison has a March 15 deadline for vacation requests. Plaintiff submitted his vacation request in June.

been disciplined within 24-months of becoming eligible for the promotion. (See Ford Dep. 149, 150, 249.) Plaintiff passed the practical examination to become an ASO in April 2002. He received a disciplinary suspension and final warning the exact same month. Therefore, Defendant was entitled to withhold Plaintiff's promotion as it did, and its withholding of Plaintiff's promotion for a short period cannot, by itself, establish discrimination. Indeed, Plaintiff's promotion was suspended only two months, rather than the full six months it could have been suspended.

Similarly, the Collective Bargaining Contract governing Plaintiff's employment expressly limits progressive wage increases to an "employee whose record has in all respects been satisfactory." (Joseph Aff., Ex. 13 (2000-2004 Collective Bargaining Contract, at 71).) As the record proves, Plaintiff's record was not satisfactory. Therefore, Defendant's decision to deny Plaintiff progressive wage increases was neither arbitrary nor impermissible. Absent evidence that similarly situated non-African-American employees were given progression bonuses despite equally unsatisfactory disciplinary records, the fact that Plaintiff did not receive progression bonuses does not support a finding of race discrimination.

### (g) Arbitrator's findings

Finally, Plaintiff argues that the arbitrator's December 24, 2003 decision to reinstate Plaintiff is sufficient to create a disputed issue of fact as to pretext. (Pl.'s Mem., at 8.) This argument is unfounded, however, because it rests on a complete distortion of the arbitrator's findings.

Defendant cited three reasons for terminating Plaintiff on January 31, 2003: (1) Plaintiff failed to report to the proper location on January 13, 2003, when his five-day suspension ended, despite express directions from supervisors on where and when to report; (2)

Plaintiff failed to contact a supervisor on January 13, 2003 when he reported to the wrong place; and (3) Plaintiff was disrespectful to two of his supervisors. Defendant considered these incidents to be acts of insubordination, and therefore acts justifying further disciplinary action. Since Plaintiff already had a five-day suspension and final warning from the same month, Defendant decided that termination was the proper form of discipline.

After five hearings, at which Plaintiff was represented by his union, and a full opportunity for both parties to be heard, the arbitrator found that Plaintiff had, in fact, reported to the wrong place and did not contact a supervisor, though he found that Plaintiff's "exercise of poor judgment . . . did not rise to the level of insubordination." (Carey Aff., Ex. II, at 17.) The arbitrator also found Defendant failed to establish by clear and convincing evidence that Plaintiff's interactions with his supervisors constituted insubordination. (Id. at 17-19.) Accordingly, because the arbitrator believed that the record did not establish that Plaintiff acted with the level of intent necessary to establish insubordination, he held that discipline for such conduct was unjustified. (Id. at 21.) The arbitrator found only that Defendant had imposed too severe a penalty; there is absolutely no suggestion that race motivated Defendant's approach to discipline. In fact, the arbitrator expressly concludes that "[t]he present record omits any persuasive evidence that the Company's treatment of [Plaintiff] occurred because of [his] race." (Id. at 21-22.) Thus, Plaintiff's argument that the arbitrators decision supports a finding that Plaintiff was disciplined because of his race is unfounded.

The Court cannot understand Plaintiff's insistence that the arbitrator's decision establishes race discrimination. Were the Court permitted to weigh evidence on a motion for summary judgment, the Court would find that the arbitrator's decision weighs heavily in favor of

Defendant.  The following evidence would be particularly persuasive:

(1) The arbitrator found that Defendant established by clear and convincing evidence that Plaintiff falsified company documents with regard to his time records on December 13, 2003 and violated a work rule on December 12, 2003. (Id. at 14-16.)  On this basis, the arbitrator found that Defendant had reasonable cause to impose a five-day suspension and all-inclusive final warning on Plaintiff on January 6, 2003.  (Id. at 20.)

(2) Throughout the decision, the arbitrator referred to Plaintiff's "poor judgment," at one point even noting that Plaintiff's record "reveals an ongoing pattern of poor judgment and of improper behavior over an extended period of time." (Id. at 21.)

(3) The arbitrator did not reinstate Plaintiff with full back pay and seniority, the logical result had the arbitrator believed that Defendant's discipline of Plaintiff was wholly unjustified.  Instead, the arbitrator converted the termination to a disciplinary suspension without pay (for full calendar year) and extended the all-inclusive final warning for an additional twelve-month period (id.), rather significant discipline in a labor-management arbitration.  If anything, the arbitrator's decision reinforced, rather than rebutted, Defendant's legitimate, nondiscriminatory explanation for its conduct.

Given Plaintiff's complete lack of evidence connecting any of Defendant's conduct to Plaintiff's race, the Court finds that the record as a whole, even when viewed in the light most favorable to Plaintiff, does not support a finding of purposeful race discrimination.  Clearly, Plaintiff experienced adverse treatment by his employer, but that is not the same as racially discriminatory treatment.  Plaintiff's performance is the true cause for the discipline imposed on him, not his race.  There is no dispute that Defendant has a right to discipline Plaintiff for his

unprofessional conduct.  Quibbling over whether Defendant imposed the "correct" discipline is not the role of the Court or the federal civil rights laws.  See, e.g., Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998) (making clear that the federal civil rights laws are not intended to be a "general civility code" policing all adverse treatment by employers).  Absent concrete, admissible evidence that similarly situated non-African-American employees were treated differently under identical circumstances, Plaintiff's discrimination claims must fail.  Accordingly, Defendant is entitled to summary judgment on Plaintiff's remaining discrimination claims under 42 U.S.C. § 1981.

B. Plaintiff's Claim of Retaliation Under 42 U.S.C. § 1981

Courts analyze claims of retaliation under the same McDonnell Douglas burden-shifting test as claims for disparate treatment.  Tomka v. Seiler Corp., 66 F.3d 1295, 1308 (2d Cir. 1995).  To make out a prima facie case of retaliation, plaintiff must show: "[1] participation in a protected activity known to the defendant; [2] an employment action disadvantaging the plaintiff; and [3] a causal connection between the protected activity and the adverse employment action." Id.; accord Cruz v. Coach Stores, Inc., 202 F.3d 560, 566 (2d Cir. 2000).  This Circuit has clarified that "[t]he term 'protected activity' refers to action taken to protect or oppose statutorily prohibited discrimination." Cruz, 202 F.3d at 566.

*1. Allegations of retaliation in Plaintiff's complaint*

Plaintiff pleads two protected activities to support his retaliation claim.  First, Plaintiff argues that bringing a lawsuit against Con Edison for misappropriation of an idea for a corporate slogan is a protected activity.  Second, Plaintiff argues that complaining to his supervisors about race discrimination is a protected activity.  Plaintiff is correct that both bringing a lawsuit

against an employer and complaining to a supervisor about racial discrimination can be protected activities. Under the facts of Plaintiff's case, however, neither one supports a claim of discriminatory retaliation.

Plaintiff's misappropriation claim cannot support a claim of retaliation under § 1981 because the lawsuit had nothing to do with race. The complaint in that action alleged misappropriation of an idea and never mentioned race as a factor in the alleged misappropriation. Thus, in bringing the misappropriation lawsuit, Plaintiff was not protesting or opposing statutorily prohibited discrimination. The fact that Plaintiff previously suggested, in an e-mail to Con Edison's Chairman, that misappropriating Plaintiff's idea fits a historical pattern in which "Black peoples' ideas have been taken and exploited for the betterment of society and industry" (Joseph Aff., Ex. 1, at 1), does not turn Plaintiff's intellectual property complaint into a discrimination complaint. Accordingly, this lawsuit does not fall under the definition of "protected activity," especially in the context of an action under 42 U.S.C. § 1981, which protects only against discrimination on the basis of race.

If Plaintiff had complained to his supervisors about race discrimination in the workplace, these complaints would be protected. Defendant could not retaliate against Plaintiff for making such complaints. The problem here is that there is no evidence in the record that Plaintiff complained to anyone at Con Edison about race discrimination at any point prior to this lawsuit. Plaintiff admits in his deposition that he did not contact the Con Edison Equal Employment Opportunity ("EEO") Department to complain about race, though he admits that he knew it existed, understood its role, and had the correct telephone number to contact the department. Plaintiff also admits that he never submitted a grievance to his union specifically complaining about race

discrimination.  His only grievance contested his January 2003 suspension and discharge as overly severe and unwarranted under the Con Edison four-step disciplinary procedure.  This grievance was not a complaint about race.  Without evidence that Plaintiff complained to a Con Edison employee or union representative of race discrimination, Plaintiff cannot bring a claim of retaliation, as there was no protected activity known to Defendant that it could have unlawfully retaliated against.

### 2. Additional allegations of retaliation

Plaintiff adds in his opposition papers an additional claim that Defendant has retaliated against Plaintiff for filing a Charge with the EEOC and subsequently filing this action. While filing a Charge of Discrimination with the EEOC and filing this lawsuit are both protected activities, Plaintiff fails to demonstrate any causal connection between these protected activities and the adverse employment actions–i.e., adjustment of employment status, negative performance evaluations, disciplinary actions, and denial of progressive raises–imposed on Plaintiff by Con Edison.  Con Edison has not taken any action against Plaintiff since March 20, 2003, the date that Plaintiff filed a Charge with the EEOC, that it did not take prior to that date.  Plaintiff has a history of negative performance evaluations, discipline, and denial of progressive raises dating as far back as the 1990s—or at least as far back as 2001, if the Court considers only Plaintiff's period of employment in Substation Operations–and the actions that Plaintiff now claims are retaliatory took place prior to March 20, 2003.  Plaintiff has shown no increase in the frequency or severity of discipline imposed since March 2003, nor has he shown a change in the type of discipline imposed since March 2003–with the exception perhaps of the adjustment of Plaintiff's employment start date.[28]  Thus, Plaintiff has established no causal connection between his EEOC Charge or his filing

---

[28]   While the March 2004 readjustment of Plaintiff's start date to exclude the 11-month period that Plaintiff was out on disciplinary suspension–an act the Court will assume is an adverse employment

of this lawsuit and the adverse employment actions taken by Con Edison in the three years.

## III. DISCRIMINATION UNDER N.Y. EXECUTIVE LAW § 296

A claim of discrimination pursuant to New York Executive Law § 296 is subject to the same analysis as a claim of discrimination under federal law. See Melnyk v. Adria Labs., 799 F. Supp. 301, 312 (S.D.N.Y. 1992) (citing Mastrangelo v. Kidder, Peabody and Co., 722 F. Supp. 1126 (S.D.N.Y. 1989)). Thus, for the same reasons that Plaintiff fails to establish disparate treatment or discriminatory retaliation under 42 U.S.C. § 1981, Plaintiff fails to establish a claim of race discrimination under New York Executive Law § 296.

## CONCLUSION

Plaintiff's claims of discrimination and retaliation under Title VII are DISMISSED with prejudice as time barred, due to Plaintiff's failure to file this action within 90 days of receipt of the Notice of Right to Sue from the EEOC. Plaintiff's claims of discrimination and retaliation under 42 U.S.C. § 1981 and New York Executive Law § 296 are also DISMISSED with prejudice, as the Court finds that Plaintiff fails to present any concrete, admissible evidence from which a reasonable jury could find that Defendant's legitimate, non-discriminatory reasons for its conduct are pretextual. Accordingly, Defendant Con Edison is entitled to summary judgment on all of Plaintiff's discrimination and retaliation claims as a matter of law. The Clerk of the Court is directed to enter judgment and close out this case.

---

action because it reduces the employee's seniority status with the company–was a new form of discipline imposed on Plaintiff only after his filing of this action, the Court finds no evidence from which a reasonable jury could find that this action was taken *because of* Plaintiff's filing of this action. The simple fact that this act came chronologically after Plaintiff complained of race discrimination does not allow the inference that the act was taken because of the protected complaint. Plaintiff did not contribute to Con Edison in any way during his 11-month disciplinary suspension without pay—a penalty upheld by a neutral arbitrator–so he is not entitled to credit for this time. Plaintiff does not provide any case law to the contrary.

its conduct are pretextual. Accordingly, Defendant Con Edison is entitled to summary judgment on all of Plaintiff's discrimination and retaliation claims as a matter of law. The Clerk of the Court is directed to enter judgment and close out this case.

Dated: New York, New York
      March 3, 2006

PAUL A. CROTTY
United States District Judge

*"Copies Mailed By Chambers"*